IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL ACTION FILE |
| v. | NO. 4:17-CR-00034-HLM-WEJ |
| RAYMONN DUSHAWN PATRICK, | |
| Defendant. | |

## **NON-FINAL REPORT AND RECOMMENDATION**

This matter is before the Court on defendant Raymonn Dushawn Patrick's Motion to Suppress Evidence [15] and Motion to Suppress Statements [16]. On June 6, 2018, the Court conducted an evidentiary hearing [24] regarding these Motions, which has been transcribed [28] (hereafter "Tr."). The parties have briefed the issues raised. (See Def.'s Br. [30]; Gov't Resp. [32].)[1] For the reasons

---

[1] At the close of the hearing, Defendant withdrew that part of his Motion to Suppress Statements [16] that challenged the recorded interview he gave to law enforcement on May 20, 2017. (See Tr. 74-83, 89-91.) Although Defendant asserted at the hearing that the statement he made at the Citgo admitting that he had a .380 pistol in his pocket (discussed infra) should be suppressed as "fruit of the poisonous tree" (id. at 91), he did not perfect that argument in his post-hearing Brief. Thus, the Court **RECOMMENDS** that the Motion to Suppress Statements [16] be **DENIED** as withdrawn or abandoned.

explained below, the undersigned **RECOMMENDS** that both Motions be **DENIED**.

I.   **THE INDICTMENT**

On September 14, 2017, a grand jury in the Northern District of Georgia returned an Indictment [1] charging that Mr. Patrick, having been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm (a Keltec model P3AT .380 mm caliber pistol), and that such possession was in and affecting interstate and foreign commerce, in violation of 18 U.S.C. § 922(g)(l).  The Indictment also contains a forfeiture provision.

II.   **STATEMENT OF FACTS**

At approximately 9:42 p.m. on the evening of May 19, 2017, a Bartow County Sheriff's Department dispatcher notified officers of receipt of a 911 call reporting that shots had been fired at 65 Valley View Drive in Cartersville, Georgia. (Tr. 7; see also Gov't Ex. 2 [26-2], at 10.)  The complainant reported that he was on his porch when an individual in a black Lincoln Town Car with a tan top fired three shots in his direction.[2]  (Gov't Ex. 2 [26-1], at 1; Tr. 7.)  At this time, law

---

[2] Corporal Chester testified that he heard over the radio that a "dark green" Lincoln Town Car was involved in the incident. (Tr. 7.)  However, the Call

enforcement had no license plate number, no description of the vehicle's occupants, and no idea how many people were in the vehicle. (Tr. 37-38.)

Within about three minutes of the shots-fired call, or at 9:45 p.m., Bartow County Deputy Sheriff Gillen (unit 915) broadcast over the radio that he located a Lincoln Town Car meeting the above description at the Citgo gas station located on the corner of Cassville and Erwin Streets in Cartersville. (Tr. 13, 40; see also Gov't Ex. 2 [26-2], at 10.)[3] Supervising Sergeant Gibbs broadcast over the radio for Deputy Gillen to wait for backup before further investigating the suspicious vehicle. (Tr. 14.) As captured on Corporal Chester's in-car recording system, the dispatcher responded that she was trying to get additional officers to "78" (respond) to the Citgo to assist. (Id. at 14-15.) In less than two minutes, at approximately

---

Narrative portion of the 911 report includes the following notes from the dispatcher: "BLK LINCOLN TOWNCAR W/ A TAN TOP… FIRED SHOTS AT COMP[LAINANT] . . . DOT [direction of travel] PORTER ST." (Gov't Ex. 2 [26-1], at 1; see also Tr. 9, 17-18, 37-38.) Upon review of the videotape taken from Corporal Chester's dashcam, even under the bright lights of the Citgo, it is difficult to discern whether the body of the Lincoln Town Car is black or dark green. (See Gov't Ex. 1 (CD).) What is clear, however, is the vehicle's very distinctive tan top.

[3] The Citgo is approximately .7 miles from 65 Valley View Drive, the location of the shots-fired incident. (See Gov't Ex. 3 [26-1], at 11 (map); Tr. 18.) Corporal Chester explained that, given that the Lincoln was travelling in the direction of Porter Street and the "only road that connects there is Redcomb Drive" that "it just kind of narrow[ed] us down on our search." (Tr. 18.).

3

9:46:57, Deputy Gillen reported over the radio that he had received backup from Cartersville Police Department officers and was investigating. (Gov't Ex. 1, at 3:40; Tr. 15-16.)[4]

Corporal Chester arrived at the Citgo at approximately 9:49:13, as reflected in the CAD report and his in-car recording system. (Gov't Ex. 2 [26-1], at 8; Tr. 17.) There were already several law enforcement officers on the scene; their "immediate goal was to try and secure the area and figure out as quickly we can who's involved with this and who's not." (Tr. 19.) Corporal Chester noted that the Lincoln Town Car in question was parked at the gas pumps and unoccupied. (Id. at 19-20.) He quickly learned that law enforcement officers who arrived earlier

---

[4] Investigator Patrick Hooton was working an extra detail that evening for the Cartersville Police Department's Rapid Response Team. (Tr. 57.) On the way back to headquarters, he and two colleagues heard the call over the radio regarding the shots fired and the possible location of the suspect vehicle at the Citgo. They stopped at the Citgo to assist. (Id. at 57-58.) When they arrived, there were already other uniformed law enforcement personnel on the scene. (Id. at 58-59.) The volume of law enforcement in the area that night was attributable to the fact that it was high school graduation weekend, and there were rumors regarding a possible retaliatory shooting involving school-age kids. (Id. at 23, 39, 57.) This Citgo gas station is also located only about one-half mile from the City of Cartersville's police and fire headquarters. (Id. at 23-24, 58.)

4

on the scene had observed shell casings in plain view in the Lincoln. (Id. at 22-23.) He also personally observed those shell casings. (Id. at 23.)

According to Corporal Chester, there were "a lot of people standing around" and law enforcement needed "to begin to start identifying people and figure out who's in which vehicle and if those people are involved here." (Tr. 19-20.)[5] The officers who arrived before Corporal Chester had already cleared a few individuals to leave, such as those who were at the Citgo before the Lincoln arrived. (Id. at 20.) Their goal was to find out who had arrived at the Citgo in the Lincoln. (Id. at 20, 41.) The officers had to exercise caution, however, because the Lincoln was unoccupied, which meant that one or more of the civilians standing around at the Citgo likely had a gun. (Id. at 25.)

Corporal Chester explained that he told a group of three or four people, which included the Defendant, "Can you wait a second?" (Tr. 21.) These individuals were asked to wait briefly so that they could be interviewed. (Id.) Although Mr. Patrick wanted to leave, he was not allowed to do so. (Id. at 44-45.) Corporal Chester asked the group, "Anybody have a clue about that car right here

---

[5] Corporal Chester estimated that there were eight to ten civilians at the Citgo and almost as many law enforcement personnel. (Tr. 40-42.)

5

[gesturing toward Lincoln]? Who's in that car?" (Gov't Ex. 1, at 5:46.) In a side conversation with another investigator, Corporal Chester learned that the Defendant stated that he had just walked to the Citgo. (Tr. 21-22, 43-44.)

At approximately the 6:23 minute mark in Corporal Chester's audio-video recording, Investigator Hooton can be heard saying, "Don't bow up. Don't bow up … don't do something stupid." (Tr. 24, 29, 61-62; Gov't Ex. 1, at 6:23.) This audio captured the Defendant being taken into custody. According to the on-screen time, this occurred at 9:49:47 p.m., or about seven minutes after the shots-fired call was communicated by the dispatcher. Investigator Hooton explained that he was standing near the Defendant, casually "shooting the breeze" and looking him up and down. (Tr. 61, 68, 71.) He observed that the Defendant was wearing athletic shorts and mid-calf socks and noticed "a pretty prominent bulge in his right sock." (Id. at 61.) Investigator Hooton asked what the bulge was, and the Defendant admitted it was marijuana and handed it to him. (Id. at 46, 61, 71.) The bulge in the Defendant's sock was significant enough that it was noticeable to Corporal Chester from about fifteen feet away. (Id. at 48-49.) At that point, the Defendant was detained for the marijuana in his sock. (Id. at 62.) After placing the Defendant in handcuffs, Investigator Hooton stepped back because other officers, including Corporal Chester, approached to assist. (Id. at 25, 63-64.)

After the Defendant was handcuffed, Corporal Chester asked him if he had anything sharp or any weapons on him. (Tr. 28-29, 50, 52, 64; Gov't Ex. 1, at 7:50.) Although the Defendant's response is difficult to hear on the video, according to Corporal Chester, he replied, "Yea, I got this .380." (Tr. 30, 52.) Corporal Chester's response is clearly audible: "You got a .380 in here? Let's not reach for it." (Gov't Ex. 1; see also Tr. 28.) Corporal Chester recovered the gun from the Defendant's left-front pocket. (Tr. 52, 54.)[6] The Defendant then volunteered that he had walked to the Citgo. (Id. at 28-29.)

When the pat down concluded and the Defendant was being escorted to a patrol car, he asked why he was being arrested; Corporal Chester replied, "The weed and the gun. That's number one and number two." (Tr. 31.) As the investigation developed, law enforcement ultimately determined that the Defendant

---

[6] Investigator Hooton took possession of the .380 Keltec handgun recovered from the Defendant's pocket and cleared it. (Tr. 32, 52, 65.) He recovered one bullet from the chamber and another from the magazine. (Id. at 32.) Corporal Chester explained that he inquired about the number of bullets recovered from the gun, because he believed that the gun recovered from the Defendant's pocket had a capacity of six bullets (five in magazine plus one in the chamber), and he knew that there were at least three visible shell casings in the Lincoln. (Id.) The chambered bullet had a light primer strike on it, indicating that the gun's operator had attempted to fire it. (Id. at 33, 52-53, 65.)

was one of three individuals who had occupied the Lincoln Town Car earlier that evening. (Id. at 34.)

### III. ANALYSIS

Mr. Patrick contends that he was subjected to an investigative detention along with every other civilian at the Citgo on May 19, 2017, and that law enforcement lacked reasonable suspicion, grounded in specific and articulable facts, that he had been involved in a completed felony. Because he contends that no lawful Terry stop occurred, Defendant argues that the gun seized from his person should be suppressed. The Government responds that Mr. Patrick and other individuals at the Citgo were briefly subject to an investigative detention while officers sought to determine who was associated with the Lincoln Town Car; that the Defendant's detention, which lasted no more than four minutes, is consistent with Terry; and that the detention transformed into a probable cause arrest when marijuana was discovered in the Defendant's sock.[7]

---

[7] It appears that the Government bases its contention that the Defendant's detention was no more than four minutes by measuring the time elapsed between an officer's identification of the Lincoln at the Citgo (9:45 p.m.) and the time of the Defendant's arrest (9:49 p.m.).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Consistent with the Fourth Amendment, a police officer may stop and briefly detain an individual for investigative purposes if the officer has a reasonable suspicion that the person was or is involved in criminal activity. United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).

While reasonable suspicion is "more than an inchoate and unparticularized suspicion or hunch," United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006) (per curiam) (internal quotation marks and citation omitted), it requires less than probable cause and "'considerably less'" than a preponderance of the evidence. Navarette v. California, 572 U.S. 393, 397 (2014) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). Indeed, reasonable suspicion "need not rule out the possibility of innocent conduct." United States v. Arvizu, 534 U.S. 266, 273, 277-78 (2002). Although an individual may ultimately be engaged in conduct that is perfectly lawful, officers may "detain the individual[] to resolve the ambiguity." Illinois v. Wardlow, 528 U.S. 119, 125 (2000). "The [reasonable suspicion] standard takes into account 'the totality of the circumstances—the whole picture.'" Navarette, 572 U.S. at 397 (quoting United States v. Cortez, 449 U.S. 411, 417

9

(1981)). "[R]easonable suspicion . . . is not concerned with hard certainties, but with probabilities," Lewis, 674 F.3d at 1304 (internal quotation marks and citation omitted), and it is "determined from the totality of the circumstances and collective knowledge of the officers," Nunez, 455 F.3d at 1226, based on what they know at the time of the detention. United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996).

As explained by the Supreme Court in Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County, 542 U.S. 177 (2004),

> Beginning with Terry v. Ohio, the Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. To ensure that the resulting seizure is constitutionally reasonable, a Terry stop must be limited. The officer's action must be "justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place."

Id. at 185 (quotation marks and citations omitted).

The facts here show that only a few minutes after dispatch broadcast notice of the drive-by shooting at 65 Valley View Drive, an officer observed a Lincoln Town Car matching the description provided by the 911 complainant at a Citgo located less than a mile away from that address. The reasonable inference was that the driver of the Lincoln Town Car proceeded directly to the Citgo from Valley

View Drive. Suspicions were heightened when officers saw three shell casings in the vehicle, which suggested that a firearm had been discharged therein. It was important to the investigation to determine who had recently occupied this car. Moreover, given the reported shooting and the presence of shell casings, it was likely that one of the civilians at the Citgo was armed, causing more concern for officers. Thus, officers prevented the customers of the Citgo—including the defendant—from leaving for a few minutes while they sought to determine who was connected to the Lincoln Town Car.

What happened in this case cannot be easily categorized as a Terry stop, because officers could not say which of the citizens detained may have been involved in criminal activity. Defendant is correct when he contends that officers had no reasonable suspicion that he had been involved in a completed felony. All law enforcement knew is that someone at the Citgo had likely been involved in a completed felony, and they needed to find out from the customers who was connected to the Lincoln.

Defendant is also correct that, as a general matter, reasonable suspicion of criminal activity must attach to the particular person stopped for there to be valid Terry detention. See Cortez, 449 U.S. at 418 ("[A]n assessment of the whole

11

picture . . . must raise a suspicion that the particular individual being stopped is engaged in wrongdoing."). However, the Supreme Court has held that the

> touchstone of the Fourth Amendment is reasonableness, not individualized suspicion. Thus, while this Court's jurisprudence has often recognized that "to accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure," we have also recognized that the "Fourth Amendment imposes no irreducible requirement of such suspicion."

Samson v. California, 547 U.S. 843, 855 n.4 (2006) (quoting United States v. Martinez–Fuerte, 428 U.S. 543, 560 (1976)); see also Lewis, 674 F.3d at 1305 ("individualized suspicion is not an absolute prerequisite for every constitutional search or seizure").

Given the lack of individualized suspicion, what happened here is more akin to police detention of potential witnesses for investigative purposes rather than a reasonable suspicion detention. Nevertheless, reasonableness is the standard to be applied. See Lincoln v. Turner, 874 F.3d 833, 844 (5th Cir. 2017) ("Fourth Amendment's reasonableness requirement constrains detention of potential witnesses to a crime."). In deciding whether this type of detention is reasonable, a court must look to "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Brown v. Texas, 443 U.S. 47, 51 (1979); see

12

also Illinois v. Lidster, 540 U.S. 419, 427 (2004) (applying Brown and finding it reasonable to detain motorists briefly at a roadside checkpoint to question them about a hit-and-run in the area).

Applying these three Brown factors, the conduct of law enforcement officers here was reasonable. First, the public concern was grave, since officers were investigating a report of a specific and known crime—a drive-by shooting. Second, questions they asked during the detention advanced the public interest in finding out whether anyone had information about the occupants of the Lincoln. Third, the detentions here interfered only minimally with the liberty of the Citgo's customers. See Maxwell v. Cty. of San Diego, 708 F.3d 1075, 1083 (9th Cir. 2013) ("Although detention of witnesses for investigative purposes can be reasonable in certain circumstances, such detentions must be minimally intrusive.").

In weighing this third factor, Mr. Patrick was detained for no more than four minutes before he was arrested based on probable cause for marijuana possession. There is little authority establishing a time limit for witness detention. See Walker v. City of Orem, 451 F.3d 1139, 1149 (10th Cir. 2006) ("We have located no federal court precedent establishing a specific time limit for witness detention."). In the related context of a Terry stop, there is no rigid time limitation or bright line rule regarding its permissible duration. See United States v. Acosta, 363 F.3d 1141,

1147 (11th Cir. 2004). Instead, the "test is one of 'common sense and ordinary human experience.'" Id. (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)). The detention here—no more than four minutes—falls firmly within the time periods that have been held reasonable for a Terry stop. See, e.g., Sharpe, 470 U.S. at 688 (twenty minutes reasonable); Acosta, 363 F.3d at 1147-48 (thirty minutes reasonable); Courson v. McMillian, 939 F.2d 1479, 1492 (11th Cir. 1991) (thirty minutes reasonable); and United States v. Farmer, No. 207-CR-50-FTM-34SPC, 2008 WL 2397597, at *13 (M.D. Fla. June 10, 2008) (fifteen minutes reasonable). The short detention imposed on Mr. Patrick here as a potential witness was reasonable.

Finally, as explained by a noted commentator, the Model Code of Pre-Arraignment Procedure supports the action taken by the officers here:

> The typical Terry stop involves the temporary seizure of a person who is himself suspected of being directly involved in past, present or pending criminal activity. Is the power so limited, or may persons be stopped for the purpose of determining whether they can provide information implicating others in criminal activity? The nature of the issue is such that it will seldom arise in court, for it is unlikely that a person stopped because he is a potential witness will have the occasion or desire to challenge this action unless something incriminating that person occurs as a consequence of the stop.
>
> The Model Code of Pre-Arraignment Procedure takes the sensible position that the power to stop may constitutionally be extended so as to encompass the brief detention of potential witnesses

>   in at least certain situations. The Code proposes that an officer be allowed to make a stop whenever
>
>>   (i) The officer has reasonable cause to believe that a misdemeanor or felony, involving danger of forcible injury to persons or of appropriation of or danger to property, has just been committed near the place where he finds such person, and
>>
>>   (ii) the officer has reasonable cause to believe that such person has knowledge of material aid in the investigation of such crime, and
>>
>>   (iii) such action is reasonably necessary to obtain or verify the identification of such person, or to obtain an account of such crime.
>
>   This provision meets a genuine need, for it provides a lawful basis whereby "an officer coming upon the scene of a recently committed crime [can] 'freeze' the situation and obtain identifications and an account of the circumstances from the persons present."

4 Wayne R. LaFave Search & Seizure § 9.2(b) (5th ed. 2017), quoting Model Code of Pre-Arraignment Procedure § 110.2(1)(b) (1975) (footnotes omitted).

As shown in the above facts, the officers had reason to believe that a dangerous felony had occurred near the Citgo. The officers had reasonable cause to believe that someone at the Citgo could identify the driver and/or occupants of the Lincoln. Finally, the action they took was reasonably necessary to identify the customers and obtain information from them. In sum, the conduct of the officers here was reasonable under the Model Code and governing case law.

## IV. **CONCLUSION**

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence [15] and Motion to Suppress Statements [16] be **DENIED**.

**SO RECOMMENDED**, this 17th day of October, 2018.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE